**PATRICE A. MISSUD** (Ca. SBN 219614)
91 San Juan Ave.
San Francisco, CA, 94112
415-584-7251 ph/fax
missudpat@yahoo.com

PLAINTIFF in pro per, and
Attorney for Julie D. Missud

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF CALIFORNIA, SAN FRANCISCO  DIVISION
UNLIMITED CIVIL JURISDICTION

PATRICE A. MISSUD,
JULIE D. MISSUD                          Case No. C 07-2625 JL

Plaintiffs

**OPPOSITION OF MOTION TO DISMISS**

vs.



**UNLIMITED**


D. R. HORTON, INC.;                      Date:   September 5, 2007
DHI MORTGAGE COMPANY, LTD, LP.;          Time:   9:30 AM
DONALD HORTON; DONALD TOMNITZ;           Judge:  Hon. James Larson
MICHAEL MASON; DANIEL CALLIHAN;
ANNIE SCHANKIN, JAMES FRASURE;
DOES 1-200

Defendants
_____


C 072625 JL        OPPOSITION OF MOTION TO DISMISS

1   **TABLE OF CONTENTS:**

2   I. INTRODUCTION                                                                    4

3   II. PROCEDURAL HISTORY AND BACKGROUND                              4

4   III. ARGUMENT                                                                      5

5           A. Collateral Estopple is no Bar to the Current Action                  5

6           B. Personal Jurisdiction over the Corporations is Appropriate as They Have Systematic and

7           Continuous Contact with California's Residents.                   7

8           C. Personal Jurisdiction over D R Horton Inc. and all Defendants is Appropriate as they

9           have Purposefully Availed Themselves of the Benefits and Protections of California Laws.

10                                                                                      8

11          D. Personal Jurisdiction over CEO Donald Tomnitz and Chairman Donald Horton is

12          Appropriate as they have Systematic and Continuous Contact with California's Residents.

13                                                                                      8

14          E. Personal Jurisdiction over Annie Schankin, Michael Mason, Daniel Callihan and James

15          Frasure is Appropriate as they have had Systematic and Continuous Contact with

16          California's Residents.                                              9

17          F. The Statutes of Limitations are Not a Bar to Plaintiffs' Causes of Action.      10

18          G. The Plaintiff's Personal Injury Claims are Ongoing, as he is an Eggshell Plaintiff with a

19          Congenital Medical Condition which Continues to be Aggravated by the Defendants'

20          Continued Outrageous Conduct.                                      10

21          H. The Plaintiffs' Fraud Claims are within the Statute of Limitations, as they were Filed

22          Within Three Years of Their Discovery Through Reasonable Diligence.      11

23          I. The Plaintiffs' Contract Claims are not Time Barred, as they were Filed Within the Four

24          Year Statute of Limitations.                                       12

25          J. The Plaintiffs' Claims that Defendants Violated USC Title 18, Section 1513 were filed

26          Within 9 months of Retaliatory Interference with their Livelihood.      12

27          K. This Federal Court in the Northern District of California is the proper forum for the

28      C 072625 JL          OPPOSITION OF MOTION TO DISMISS

Convenience of all Parties, and especially when Considering this Forum's Interests.

13

CONCLUSION                                                                                        15

**TABLE OF AUTHORITIES:**

CASES:

*Cantu v. Resolution Trust Corp.*, 4 Cal App. 4th 857, 899 (1992)                 11

*Cornelison v. Chaney*, 16 Cal. 3d 143 (California Supreme Court, 1976)            7

*Coscia v. McKenna & Cuneo*, 25 Cal. 4th 1194, 1201 n.1 (2001)                    6

*International Shoe Co. v. State of Washington,* 326 US 310, 316 (1945)           9

*Lueck v. Sundstrand Corp.*, 236 F. 3d 1137, 1142 (9th Cir. 2001)                13

*Piper Aircraft Co. v. Reyno,* 454 US 235, 241 (1981)                            14

*United States v. Alcoa,* 148 F. 2d 416, 2nd Circuit (1945)                      13

*United States v. Grinnel,* 384 US 563, (1966)                                   13

*United States v. United Shoe Machinery Corp.,* 110 F. Supp. 295 (1953)          13

*Heatransfer Corp. v. Volkswagenwerk A.G.,* 434 US 1087 (1978)                   13

STATUTES:

California Code of Civil Procedure, Section 338(d)                               11

**INTRODUCTION:**

Within the past few months, the Plaintiff's priorities have focused on preventing Defendants' ongoing nationwide consumer fraud by communicating with federal agencies, Congress, State Attorneys General, consumer advocates and affiliates, wall street analysts, syndicated media, private attorneys, and the general public. The Plaintiffs have also been trying to avoid further Title 18 retaliatory efforts, the last use of force and fear occurring on August 3, 2007, within two weeks that this opposition was due.

The Plaintiffs have now also opted to pursue their individual claims on their own behalfs before this Court. Plaintiffs agree with defense that this has been a 'lengthy saga.' The Plaintiffs' inexperience with civil procedures and litigation has no doubt added to the delay. However, the unlimited resourced Defendants' repeated claims of non receipt of professionally served documents in four rounds of services did not further judicial efficiency. Such false claims by the Defendants and the seven attorneys representing the $11B corporation and its agents stopped only after digital pictures were taken of the fifth round of services. The ordinary middle income Plaintiffs are grateful that Defendants were finally gracious enough to waive formal service in this current Federal action in the first ever step towards judicial economy. The stated numbers infra are conservative approximations of data already collected and increasing daily as of the date of this submission. Some witness names have been redacted in this opposition and the accompanying declaration for privacy but are available to this Court in camera.

**PROCEDURAL  HISTORY AND BACKGROUND:**

Plaintiff's initial personal injury case #05-444247 in San Francisco's Superior Court was dismissed without prejudice for failure to file his oppositions timely.  The oppositions were filed 8 instead of the 9 court days before the hearing. The identical complaint was then refiled under #05-447499 and served approximately four times on each defendant.  At oral argument on April 20, 2006, the judge tentatively ruled that based on "the 29 or 30 contracts–contact claims and the nature of the contacts, the nature of the contracts that were the result of the contacts would probably suggest

1   specific jurisdiction [over D R Horton Inc.], not general jurisdiction." [Exhibit 1, April 20, 2006

2   transcript, Page 2, lines 14-18]. The specifics of the contacts were then laundry listed by Judge

3   Warren at page 5 lines 1-15. At the end of the hearing, Judge Warren requested that each side

4   submit its proposed form of order. The Plaintiff once again filed his papers one day beyond the

5   statutory limit and the Defendants' order was automatically adopted by default. [Exhibit 2,

6   Register of actions, 05-447499, April 26&27, 2006 entries]. During a subsequent January 11,

7   2007 hearing, the then presiding Judge Busch was asked to rule on jurisdiction over the remaining

8   defendants. After having heard of the Plaintiff's discovery of seven other consumers who had been

9   similarly defrauded, Judge Busch implied that but for the technicality that his instant ruling would

10   close case 499, he would have considered as evidence an additional 40 California consumers who

11   had been systematically and continuously contacted, and defrauded, to prove minimum contacts.

12   [Exhibit 3, January 11, 2007 transcript, page 4, lines 5-24]. In May of 2006, the Plaintiffs

13   conducted discovery in their own and neighboring communities in Nevada. The discovery

14   indicated that not only had the Plaintiffs and seven others been defrauded, but that dozens, perhaps

15   hundreds of other consumers had as well. More discovery from that point forward yielded dozens

16   more consumers from numerous states, California included, who had likewise been defrauded. On

17   October 23, 2006, the Plaintiffs filed State Court case #06-457207 for their specific fraud. By this

18   time, over 40 other defrauded Californians had been discovered, their contact information already

19   forwarded to Federal regulatory authorities and the State Attorney General. On February 15,

20   2007, the state court adopted its prior ruling from case 499 and granted Defendants' motion as to

21   all Defendants *without considering evidence of the additional 40 defrauded California consumers.*

22   **ARGUMENT:**

23   **Collateral Estopple is no Bar to the Current Action**

24   To invoke collateral estopple, three elements must be shown: 1. That the issue necessarily decided

25   in the previous proceeding is *identical to the one* that is sought to be relitigated; 2. The previous

26   proceeding terminated with a final judgment *on the merits*; 3. the party against whom the collateral

27

28   

1   estopple is asserted was a party to or in privity with a party in the previous proceeding. [*Coscia v.*

2   *McKenna & Cuneo*, 25 Cal. 4th 1194, 1201 n.1 (2001), italics for emphasis].  The issues in this

3   Federal Court are quite different.  In the prior State Court cases, the issue was whether the 30

4   communications between the Plaintiffs and the Defendants were of a sufficient quality and nature

5   to bestow jurisdiction over the Defendants.  The different issue before this Federal Court in this

6   case is whether systematically contacting **over 40** defrauded California consumers, in addition to

7   the Plaintiffs, is sufficient to bestow jurisdiction over the Defendants.  The State Court never

8   considered the merits of the **over 40** defrauded California consumers in its ruling as Judge Busch

9   would likely have entertained prior to his January 11, 2007 ruling.  Moreover the second related

10  issue now before this Court also includes whether a federally mandated clause incorporated within

11  each and every sales contract executed from coast to coast and in every state where Defendants

12  sell their products, was fraudulently violated when selling homes to Californians in particular.  This

13  requires judgment on the merits which only a federal court can provide.  That clause reads, "Buyer

14  is not required to use CH Mortgage Company, Ltd. [now dba DHI Mortgage] as a condition of the

15  purchase of the property from D R Horton Inc....," ["Clause"] and is required by federal antitrust

16  and banking laws. Discovery of the Defendants' pattern of the repeated violation of this Clause

17  was not discovered prior to late May 2006 investigations, and not with any great clarity until after

18  the last January 11, 2007 state court hearing.  The varied schemes in violation of the Clause are

19  still currently coming to light, as aggrieved consumers document their complaints, both with the

20  Plaintiffs and the federal and state regulatory authorities.  A few of the documented violations

21  which have been reviewed and confirmed by several mortgage professionals, experts and corporate

22  insiders, many of whom are also counted among the Defendants' defrauded consumers, are:

23  interest rate manipulation while under contract during which time the rate is supposedly fixed,

24  good faith estimates which are far underestimated requiring substantial settlement funds at closing,

25  requiring the use of Defendants' mortgage services to purchase the tied product or home, requiring

26  the use of Defendants' mortgage services to receive discounts and incentives in violation of

27

28

1  RESPA, not crediting consumers' accounts with incentives or misapplying those incentives

2  towards illusory expenses, charging consumers with late payment penalties when closing is delayed

3  by the Defendants, assessing home values differently when financing in house vs. with an outside

4  lender, expediting closing dates while simultaneously denying outside lenders required information

5  to coerce consumers into signing with the Defendants' mortgage company, promising consumers a

6  low interest rate to induce them into a contract only to later increase that rate and sometimes

7  several times during the loan approval process, claiming that the required pre approval through

8  Defendants' in house lender is only 'preliminarily approved' when in fact the approval is 'fully

9  approved' to delay and thwart consumers' attempts at receiving an outside loan, requiring

10  consumers to falsify federal documents or directly falsifying the documents to make the loan

11  approval possible.......... The current and very different jurisdictional issues in this Federal Circuit

12  Court for the Northern District of California are whether the Defendants have systematically and

13  continuously violated federal law, within California, in at least the dozen above listed ways, when

14  contacting-contracting with over 40 Californians, the Plaintiffs among them, and some as recently

15  as August of 2007. [Exhibit 4].

16  **Personal Jurisdiction over the Corporations is Appropriate as They Have Systematic and**

17  **Continuous Contact with California's Residents.**

18  "The cause of action must arise out of an act done or transaction consummated in the forum, or

19  defendant must perform some other act by which he purposefully avails himself of the privilege of

20  conducting activities within the forum, thereby invoking the benefits and protections of its laws."

21  [*Cornelison v. Chaney*, (California Supreme Court, 1976), 16 Cal. 3d 143]. As stated supra, the

22  corporate Defendants have contracted with over 40 California consumer residents. Furthermore,

23  by incorporating the Clause into every contract for the sale of a home throughout the United

24  States, California included, the corporate Defendants have purposefully availed themselves of the

25  privilege of conducting activities within California, thereby invoking the benefits and protections of

26  its laws. Indeed, the corporate Defendants could not have conducted any sale of any homes in

27

28  C 072625 JL        OPPOSITION OF MOTION TO DISMISS                                    7

1  California, or anywhere in the United States, without inclusion of the Clause.

2  **Personal Jurisdiction over D R Horton Inc.  and all Defendants is Appropriate as they have**

3  **Purposefully Availed Themselves of the Benefits and Protections of California Laws.**

4  As in the cited holding from *Cornelison v. Chaney* above, jurisdiction over the Defendants is

5  appropriate if they have invoked the benefits and protections of California laws.  Beginning across

6  the border east of California, on June 2, 2006, David Jennings, Nevada agent and inside counsel to

7  D R Horton Inc. filed a complaint with Nevada's Board of Professional Engineers, claiming that

8  the Plaintiff was illegally operating his engineering/construction business in Nevada.  Also, "on or

9  about June 5, 2006, information was received [by Nevada's Contractors' Board] alleging that [the

10  Plaintiff] unlawfully advertised as a contractor." Then in mid August 2006, agent Jennings sent the

11  Plaintiff a letter claiming that the Plaintiff, a California attorney, was similarly and illegally

12  operating his business as an unlicensed attorney in Nevada.  He stated at the end of his letter that

13  "if disciplinary action is taken by the State Bar of Nevada, it may result in disciplinary proceedings

14  against you in other jurisdictions and could affect the status of your bar license in those *other*

15  *jurisdictions.*" Finally in October 2006, Leonard Marquez, attorney and agent for D R Horton Inc.

16  et al, filed a complaint against the Plaintiff for being a federal whistle blower, *with California's*

17  State Bar, seeking to enforce Rule 5-100 of the *California Rules* of Professional Conduct, on

18  behalf of his clients.  [Exhibits 5].  None of the four regulatory agencies from the two states

19  imposed any disciplinary actions whatsoever, even though the attempt to invoke the benefits of

20  both Nevada *and California laws* was certainly made by D R Horton Inc. and the other

21  Defendants by association through their common defense firm.

22  **Personal Jurisdiction over CEO Donald Tomnitz and Chairman Donald Horton is**

23  **Appropriate as they have Systematic and Continuous Contact with California's Residents.**

24  As stated in the sworn declaration by David T. Morice at page 3, paragraph 9, both Tomnitz and

25  Horton do not "in the[ir] ordinary course of corporate responsibilities have any involvement in day

26  to day operations of the company's sales offices or affiliated lenders."  The implication is that they

27

28

have more global duties in generally overseeing nationwide sales practices of both the homes under contract, and the financing of those homes through their affiliated lenders. Each and every contract for the sale of a D R Horton Inc. home anywhere in the nation contains the Clause which is binding on both D R Horton Inc. and its consumers across the country, California included. All Board members inclusive of both Tomnitz and Horton are responsible for the contents of their contracts to which they systematically and continuously bind California consumers and other consumers nationwide. At the time of this writing, in excess of 13 states' consumers have reported the same or similar financial frauds as those listed supra, California among them. [Exhibit 6, under "Predatory Lending" pages 1-17].

**Personal Jurisdiction over Annie Schankin, Michael Mason, Daniel Callihan and James Frasure is Appropriate as they have had Systematic and Continuous Contact with California's Residents.**

At least ten California residents have had systematic and continuous contacts with Defendant agents Schankin, Mason, Frasure and Callihan. Schankin was the sales agent for D R Horton Inc, and Mason, the DHI Mortgage broker for those sales. Frasure and Callihan were their respective agent supervisors at the times of the sales and loan originations. The Missuds, Songs, Yoons, LaRoche, Carter, and two other home purchasers applied for the required DHI Mortgage loan applications along with the sales for their homes. All the legal documents which included the Clause were executed on behalf of D R Horton Inc. by its agents, and several of them under fraudulent circumstances. The Songs were told by DHI Mortgage agents that their interest rate would be 5.5% with 10% down. After they issued $15,000 as earnest money deposit, they were told that their rate would be 7.75% but only if they put 30% down. Since they couldn't come up with $200,000, D R Horton cancelled their contract and kept their deposits. The Yoons put down $17,000 as earnest and for upgrades. At that time they were also promised discounts. When they subsequently went to close the loan, they were told the discounts would not be honored. They then made a new deal with different discounts and a higher interest rate. When they went to sign that second loan, those discounts were likewise denied and the interest rate inflated yet again.

1   They desperately tried to make a third deal, but D R Horton opted to instead cancel the contract
2   and keep their deposits.  LaRoche was pre approved with an outside lender loan package.  He
3   brought it to the attention of the DHI Mortgage agents who claimed that they not known that such
4   competitive loans were available.  The two agents had seen the identical loan package which had
5   been faxed to their office the prior month by the Missuds.  Carter and two other Californians were
6   given closing dates.  Those dates had been accelerated by D R Horton requiring their immediate
7   travel to Las Vegas to sign documents, each respectively on two occasions.  On both occasions,
8   none of the documents were ready as represented.  Only after the three Californians indicated that
9   they would travel at the drop of a dime to perfect their contracts and not allow for contract
10  cancellation and deposit forfeiture, were the documents readied for execution in the following
11  weeks.

12  **The Statutes of Limitations are Not a Bar to Plaintiffs' Causes of Action.**

13
14  Ironically, the Defendants have relied on Plaintiff's dated receipt of certified communications to try
    and prove the expiration of various SOL's.  They have conveniently ignored the fact that they
15  themselves have received dozens of certified, some signed with return receipt, communications
16  sent to Corporate headquarters and addressed to CEO Tomnitz and Chairman Horton which have
17  repeatedly demanded that all illegal federal criminal activity inclusive of predatory lending cease
18  immediately.  Apparently only the California Plaintiffs actually receive dated USPS certified mail
19  which according to Defendants is not their case in the lone star state of Texas.
20
21  **The Plaintiff's Personal Injury Claims are Ongoing, as he is an Eggshell Plaintiff with a**
22  **Congenital Medical Condition which Continues to be Aggravated by the Defendants'**
23  **Continued Outrageous Conduct.**

24  "A cause of action for intentional infliction of emotional distress accrues, and the statute of
25  limitations begins to run, once the plaintiff suffers severe emotional distress as a result of
26  outrageous conduct on the part of the defendant." [*Cantu v. Resolution Trust Corp.*, 4 Cal App.
27  4th 857, 899 (1992)].  The Plaintiff has a congenital kidney disease called medullory sponge kidney.

28    C 072625 JL        OPPOSITION OF MOTION TO DISMISS                                          10

The tubes in both kidneys are misshapen and dilate as they exit, which slows fluid flow rates and allows for mineral stone formation within the organs.  The Plaintiff Patrick Missud has "countless tiny calcifications bilaterally" which on average pass through his urinary tract once per month. Normally, the stones pass without complication.  However, when exposed to mental stress and accompanying abdominal muscle tension, the type experienced when peering over precipices, or riding on roller coasters, or receiving news that he has instantly lost $70,000.00, or receiving news that complaints have been filed which could interfere with his three professional businesses and incomes, or the knowledge that an explosive device was detonated to blow a hole through his pickup truck, the Plaintiff's stones pass with greater difficulty and are usually accompanied by deep orange bloody urine.  Of the eight larger stones which all have a unique and common chemistry traceable only to the Plaintiff, and collected within the past 12 months, at least two of them caused the Plaintiff distress as described above.  The Plaintiff believes that each distressing episode coincided with yet another of Defendants' ongoing varied extreme and outrageous conducts within the past twelve months, and well within the two year statute of limitations.

**The Plaintiffs' Fraud Claims are within the Statute of Limitations, as they were Filed Within Three Years of Their Discovery Through Reasonable Diligence.**

"An action for fraud must be brought within three years of the alleged fraud, *or within three years from the time the plaintiff should have discovered the alleged fraud through reasonable diligence."* [California Code of Civil Procedure, Section 338(d), italics for emphasis].  On or about February 19, 2004, the Plaintiff knew that "the defendants had over a $75,000 incentive to improperly claim that plaintiff had *breached the contract* for the property." [Exhibit 7, page 3, line 1, Complaint for Intentional Infliction of Emotional Distress, CGC 05-447499, italics for emphasis].  The words contained in that admission are plain in that there was likely a breach of contract. Also mentioned in that statement was that there was perhaps some impropriety. However, since allegations for fraud must be pled with "particularity" as per FRCP Rule 9, the Plaintiff intentionally did not at that time claim any fraud.  In February 2004, the Plaintiffs had no

idea of Defendants' more than dozen frauds which were rampant throughout the nation and which they themselves fell victim to. It wasn't until Plaintiff's reasonable and diligent discovery by direct mailings to hundreds of his neighbors in May of 2006 that the breadth of the fraud was uncovered and could be specifically outlined with "particularity" in their complaint filed on October 23, 2006. Prior to May 2006, the Plaintiffs could not have imagined that the Defendants had the audacity to brazenly violate federal laws in so many ways and affecting so many consumers nationwide in all 27 market states. The fraud claims have been filed in this Federal Court within 13 months of their having been "discovered through reasonable diligence," and well within their three year statute of limitations.

**The Plaintiffs' Contract Claims are not Time Barred, as they were Filed Within the Four Year Statute of Limitations.**

The Contract for the Property was executed in November 2003, and closed in March 2004. The contracts claims involve a determination of whether a federally mandated Clause was violated and breached. Only a federal court can could make such a determination.

**The Plaintiffs' Claims that Defendants Violated USC Title 18, Section 1513 were filed Within 9 months of Retaliatory Interference with their Livelihood.**

For that matter, on August 3, 2007, days after the Plaintiff collaborated with journalists from Business Week which printed three articles regarding predatory lending and web "gripe" site publishing, the Plaintiffs' truck sustained major damage resulting from the detonation of some type of explosive device placed on its hood. Not only have the Plaintiffs' livelihood been threatened, but they now allege that the Defendants have threatened them with physical injury through use of force as per section 1512. For approximately six months, the Defendants have had photographs of the Plaintiffs' three trucks displaying signs referencing their consumer protection web sites. A copy of the police incident report #070793172 (when available) and cover letter with exhibits to the San Francisco FBI is attached to the Missud declaration as Exhibit 8.

**This Federal Court in the Northern District of California is the proper forum for the**

**Convenience of all Parties, and especially when Considering this Forum's Interests.**

In deciding whether to dismiss an action on forum non conveniens grounds, the court must examine: (1) whether an adequate alternative forum exists, and (2) whether the balance of private and public interest factors favors dismissal. [*Lueck v. Sundstrand Corp.*, 236 F. 3d 1137, 1142 (9ᵗʰ Cir. 2001)]. As admitted by the Defendants in their very own 2006 Annual Report to Shareholders, published on the web at 'D R Horton,' and found next to or below 'drhortonsucks.info,' the majority of Defendants' sales occur in California. At pages 21 and 75 for fiscal year 2006 the single state of California produced more "net sales, revenues and income" than other entire regions located throughout the United States. For that matter, Defendants' tables are organized by the following geographic categories: Northeast, Southeast, South Central, Southwest, California, West. The only apple among these oranges is the great state of California where Defendants sell a great majority of their homes, 'bundled' with financial services. In speaking of those financial services, since 1945, according to the Supreme Court holdings in U.S. v. Alcoa, Grinnel, United Shoe, and Heattransfer v. Volkswagenwerk, market shares in excess of 70% were strongly suggestive of anti competitive monopoly power as evidenced by the *power to control prices, exclude competitors, maintain high profits over extended periods of time and the failure of other goods and services to respond as substitutes.* Defendants have admitted to a 94% 'captive business percentage' for mortgage loan services 'captured' from their home building operations. In third quarter 2007, the Defendants did even better. Ninety five out of every 100 homes D R Horton Inc. sold also had their mortgage loans originated by DHI Mortgage. The dozens of California consumers among the dozens more non Californians, who are all available to this Court for examination, have stated to the Plaintiffs and regulatory authorities that their *origination fees, closing costs, and interest rates were inflated*, and that *attempts to obtain outside financing was near or utterly impossible.* The Defendants have admitted in at least their last six Annual Reports that their *DHI Mortgage generated profits have increased each and every year for at least five years* to a total of $236.6 Million in 2006 alone. [2006 Annual Report to

Shareholders, page 33]. If market shares over 70% are presumed anti competitive, then 25 out of every 100 homes sold in California, Defendants' single largest state/region for "net sales, revenues and income," are presumptively sold with anti competitive (and fraudulent high rate) loan financing through their loan affiliates, DHI Mortgage Company, Ltd. LP, DHI Mortgage Company, Ltd, GP........... Indeed, the highest incidents of related foreclosures happen to coincide with these higher interest rate loans and are located in Northern California, Counties of Stockton, Modesto, Yuba City, Sacramento, and Vallejo where D R Horton Inc. has dozens of developments. In Stockton alone, one out of every 27 homes is going into foreclosure. The Plaintiff actually physically visited at least 6 of D R Horton's Stockton developments where he discovered numerous defrauded, English as a second language, California consumers. [Exhibit 9]. Other forums exist for this controversy, such as the Southern District of Georgia, where a similar suit seeking class action status has been filed within months of Plaintiff's web postings, but none with greater relevance or interest than the Northern District of California. [Exhibit 10].

The relevant factors to be considered with respect to private interests of the litigants are set forth by the court in *Piper Aircraft Co. V. Reyno* [454 US 235, 241 (1981)]. *Piper* considered (1) ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses, (3) the cost of obtaining attendance of willing witnesses and (4) all other considerations that would make trial of a case easy, expeditious and inexpensive. Plaintiffs' medical records, and 'lengthy saga' of court documents are all located within the Bay area. Witnesses to the Plaintiffs' transaction who would testify as to the effects that the transaction had on the Plaintiffs are domiciled in the Bay area. Doctors, Mortgage consultants and even the escrow officers who notarized the purchase Contract live within 20 miles of this District Court house. The Federal 9th Circuit District Court has jurisdiction over all of California as well as Nevada. If required, this Court can compel the availability of all witnesses, willing or not. Defendants argue that their travel to California would be unduly burdensome. CEO and defendant Tomnitz has admitted in his recent July 26, 2007 conference call starting at minute 51, and available online under the 'Investor

1  Relations' tab at 'd r horton', that he "travels around the country...., has been in the field for the

2  past 6 weeks......, and just went through the Northeast region...." to visit individual developments.

3  Tomnitz is the CEO of $11 Billion D R Horton Inc. and can come to California to represent

4  himself and the company as its most knowledgeable officer when he next visits the developments in

5  Stockton, Sacramento, Vallejo.........  As for expense, the D R Horton corporation can no doubt

6  afford first class cabin accommodations for the remaining Defendants, whereas the Plaintiffs have

7  already been financially injured by the Defendants and have far less financial resources to travel.

8  Please note that at no time within the past three years have the Defendants attempted to make this

9  litigation inexpensive for the Plaintiffs, or efficient for the Courts.  Lastly and ironically, the

10  Defendants in their Motion to Dismiss at page 13, line 26 state that "the parties themselves

11  contractually agreed to a choice of law provision adopting laws of the state of Nevada."  They

12  conveniently forget that the Plaintiffs also had the choice of lender Clause as listed on page one of

13  the Contract, and with very unclean hands opted to not honor it.

14  **CONCLUSION:**

15  The prior state court cases addressed different jurisdictional issues and were not based on the

16  merits of the facts presented in this federal case.  Indeed, the present issues could not have been

17  ruled on by any state court.  Personal jurisdiction over the corporate Defendants is appropriate

18  because they have admitted to purposefully availing themselves of California as their most lucrative

19  net sales state.  They have invoked the benefits and protections of California Department of

20  Corporations laws by including the federally mandated Clause within their contracts which allows

21  them to sell homes in California.  The Defendants have purposefully availed themselves of

22  California's laws by filing with the State's Bar to investigate the Plaintiff.  Individual Defendants

23  Tomnitz and Horton have systematically and continuously contacted California consumers with

24  their contracts which have been crafted by them and the other Board members from their Fort

25  Worth headquarters.  They have each required that California consumers be bound by the terms of

26  their own drafted contracts.  Individual Defendants Schankin, Mason, Frasure and Callihan have

27

28  C 072625 JL        OPPOSITION OF MOTION TO DISMISS                                    15

each had systematic and continuous contacts with at least ten California consumers. All the defendants have in some way acted fraudulently as described supra. The statute of limitations have not run for any cause of action. The Plaintiff's personal injuries are discrete. Each injury has been caused and/or aggravated by Defendants' ongoing outrageous conduct. Several of the injuries have been sustained well within the two year statute of limitations. The varied frauds have been filed within three years of their having been discovered through reasonable diligence. It was only since May 2006 that the Plaintiffs could have pled the fraud with any particularity as is required for making such claims. The contracts claims have been filed within their four year statute of limitations. Claims of violation of Title 18, Chapter 1500 were filed within 9 months of retaliatory interference with Plaintiffs' livelihood.......and physical safety.

No other jurisdiction or Federal Court has as much interest in this controversy as the Northern District of California, San Francisco branch. This Court is located within 100 miles of the California counties with the highest foreclosure rates resulting from identical predatory lending as is alleged here, and was suffered by the Plaintiffs. The $11B corporation and its agents are far better financially suited to travel to San Francisco where the majority of documents and witnesses reside.

Notwithstanding the Defendants' claim that the Plaintiffs have only alleged a "grand conspiracy to defraud [them]," the Plaintiffs have submitted some evidence that Defendants will likely object to as hearsay. Among a few of the Plaintiffs' submissions are: hundreds of consumer statements posted on the web and verifiable through direct consumer contact; hundreds of consumer emails verifiable through direct consumer contact; nationwide syndicated news and articles explaining the current "mortgage melt down" and the predatory lending practices that led to the crisis; myriad official government documents filed under the penalty of perjury with over 30 state and federal regulatory authorities; official Nevada Attorney General documents stating that their Deputy Commissioner for Mortgage Lending was no longer with that agency within one month of Plaintiff's inquiries and subpoenas to her office; five incidents of vandalism coinciding with

Plaintiffs' varied court filings and consumer efforts which daily have a significant financial impact on the Defendant corporations; Defendants' admissions and contradictory statements as stated on their official web site and years of correspondence with the Plaintiffs and in court documents; undisturbed Supreme Court rulings stating guidelines to be observed to prevent antitrust violations, which incidentally seem to have been brazenly ignored by the Defendants; another recent federal court filing claiming the same type of fraud as alleged in this complaint and which was filed months after Plaintiffs' broadcasting of the very same corporate Defendants' fraudulent activities...............Plaintiffs could go on for pages, but for the sake of brevity stop here.

Lastly, the Plaintiff would like to point out that the Defendants have not followed through with their many threats to file defamation suits regarding Plaintiff's internationally broadcasted web sites, which have unequivocally injured and disgraced individual Defendants' reputations by linking them to criminal acts, and have had a very significant detrimental monetary impact on the $11B D R Horton corporation and its affiliates.  The Plaintiff suggests that such inaction is perhaps tacit admission of the well over 100 pages of content currently being broadcasted to the world and read by thousands of weekly consumers, wall street analysts and Georgia attorneys.  Otherwise, the Defendants should file such a suit and then the Plaintiff could defend, and counterclaim, with truth and his hundreds of direct evidentiary submissions and witnesses.


I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in San Francisco, California.


_____

Patrick Missud, Esq.                              Date
Sole owner, drhortonsucks.info et al.